**158**

UNITED STATES of America,

v.

RW PROFESSIONAL LEASING SER-
VICES CORP., also known as "Profes-
sional Leasing Services," Rochelle Bes-
ser, also known as "Rochelle Drayer,"
Barry Drayer, Roger Drayer, Adam
Drayer, Myrna Katz, and Stephen Bark-
er, Defendants.

No. 02 CR 767(ADS)(MLO).

United States District Court,
E.D. New York.

April 20, 2005.

Roslynn R. Mauskopf, United States Attorney Eastern District of New York by Geoffrey R. Kaiser, Assistant U.S. Attorney, Central Islip, NY, for Plaintiff U.S.

Frankel & Abrams by Stuart E. Abrams, Esq., New York City, for Defendant RW Professional Leasing Services Corp.

Simon & Partners LLP by Bradley D. Simon, Esq., Kenneth C. Murphy, Esq., of Counsel, New York City, for the Defendant Rochelle Besser.

Elizabeth Macedonio, Esq., Bayside, NY, for Defendant Barry Drayer.

Jerald Rosenthal, Esq., Ghent, NY, for Defendant Roger Drayer.

Maurice Sieradzki, Esq., New York City, for Defendant Adam Drayer.

John S. Wallenstein, Esq., Mineola, NY, for Defendant Myrna Katz.

Terrence P. Buckley, Esq., Islandia, NY, for Defendant Stephen Barker.

Moritt Hock Hamroff & Horowitz LLP by Michael S. Re, Esq., Michael Cardello, III, Esq., Garden City, NY, for non-party movant CIT Group, Inc.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This decision concerns a motion pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure ("Fed. R.Crim.P.") by non-party CIT Group, Inc. ("CIT") to quash the Subpoena ducus tecum (the "Subpoena") served by RW Professional Leasing Services Corp. ("RW"). In the alternative, CIT seeks to limit or modify the Subpoena.

## BACKGROUND

On or about April 2, 2003, RW was indicted and charged, along with other defendants, with conspiracy to commit bank fraud and wire fraud, and with committing bank fraud, and money laundering. According to the superseding indictment filed on March 4, 2004, RW was a closely held corporation that arranged financing for medical providers to lease equipment and offered working capital loans to medical providers. To provide these services, RW obtained loans from financial institutions for the purported purpose of purchasing medical equipment that would be leased to medical providers. In many instances, the leases and the medical equipment served as collateral for the loans.

The indictment charges that RW devised a scheme that involved submitting sham documentation to financial institutions in order to create the false impression that RW was providing leases for its customers. It is further alleged that RW issued phony equipment invoices directly to the medical providers in order to receive payments that should have gone directly to the lending institutions. Instead of submitting the medical provider's lease payments to the lending institutions, it is alleged that RW would intentionally retain the lease payments. In addition, it is alleged that RW concealed prepayments and defaults of medical providers by creating false checks that were designed to make it appear as though the medical providers were continuing to make payments under their leases.

Newcourt Leasing Corporation ("Newcourt"), formerly known as AT & T Capital Leasing Services, Inc. ("AT & T Capital"), was one of the lending institutions that RW dealt with in these financial transactions. CIT, the non-party and movant in this dispute, is the successor to Newcourt. Beginning in 1992, RW was one of approximately 30 other lease originators that participated in a leasing arrangement with AT & T Capital known as the "Private Label Program." This program allowed lease originators to arrange all aspects of a capital lease and then present it to AT & T Capital for funding. This included originating the leases; approving applications; generating lease documents; and approving all vendors, brokers, and end-users. After preparing the lease, the lease originator would then present the leases to AT & T Capital. If AT & T Capital decided to become the funding source it would purchase the lease contract for a discounted price.

Through the Private Label Program, AT & T Capital was assigned leases by RW and was granted a continuing security interest in all equipment included in those leases, but it did not assume any of RW's obligations or duties. At one point during their business relationship, the RW portfolio of leases funded through AT & T's Capital exceeded $53 million and included more than 1,300 lessees.

In August 1995, AT & T and RW ceased doing additional business with each other but RW continued to manage and service the leases that remained affiliated with AT & T. In that same year, CIT succeeded AT & T Capital and withdrew the remaining leases that were being serviced by RW. It is further alleged that when CIT introduced itself to the lessees of these leases it became aware of the apparent conversion of CIT's funds and the fraudulent and wrongful action of RW and its principals as detailed in the indictment.

In 1996, RW commenced a law suit in Nassau County Supreme Court against CIT (the "state action") alleging certain contract claims related to the withdrawal of the leases. In this action CIT brought several counterclaims against RW and its principals asserting, among other things, fraud, misrepresentation, conversion, and a request for a permanent injunction. The state action lasted for seven years. In April 2003, the state action was settled after the commencement of the criminal proceeding against RW.

There was extensive discovery by and between CIT and RW in the state action. CIT asserts that it responded to fourteen separate document demands and three separate sets of interrogatories propounded by RW. CIT also states that no less than eighty-eight banker's boxes of documents were exchanged. The documents that RW sought in the initial proceeding were retrieved by CIT from computer databases that have been in use since 1992. In order to comply with discovery, CIT had to employ a computer

consultant to write computer programs that could extricate the necessary information from these databases. This consultant was employed at the expense of CIT so that they could comply with RW's discovery demands.

On August 25, 2004 RW filed the Subpoena with the Deputy Clerk of the United States District Court for the Eastern District of New York. The Subpoena consists of twenty-one document requests. On November 11, 2004, CIT filed the instant motion to quash the Subpoena arguing that it should not be compelled to comply because the requests are general and unspecific. In addition, CIT claims that many of the documents sought by the Subpoena are not relevant and are inadmissible.

In particular, CIT states that they should not have to re-produce the documents that were exchanged during discovery in the state action because they were either already produced and provided by CIT to RW, or produced to CIT by RW. CIT also asserts that the document requests consist of only generalized and unspecified demands that would result in the production of every document ever created, generated, or received in relation to RW's 1,300 leases funded by AT & T. CIT contends that fourteen of RW's requests for documents lack specificity; are overly broad; and fail to focus on the events where RW is alleged to have engaged in fraudulent and wrongful activities. In addition, according to CIT many of the requests seek companywide information that is wholly irrelevant to RW and its criminal litigation.

CIT also claims that the Subpoena served upon it is unreasonable and oppressive. CIT asserts that the requests were not made in good faith and therefore constitute a "fishing expedition." It further states that any production of documents in accordance with the Subpoena should properly be limited to those relevant documents which pertain to the accounts relating to the alleged fraudulent and wrongful activities of RW and its principals.

RW concedes that certain documents were provided during the state action, and that those documents need not be re-produced. However, RW claims that CIT did not fully comply with RW's discovery requests in the state action, and therefore, in that respect

the Subpoena in the criminal action does not request duplicative material. RW also claims that CIT has not, in these motion papers, provided any specific information as to what documents it has already produced in response to RW's requests. RW proposes that CIT provide it with a Bate-stamp number and a certificate of authenticity for all the documents it has already produced so that the information may be admissible as evidence under Rule 803(6) of the Federal Rules of Evidence. RW also argues that many of the documents produced in the state action by CIT were substantially redacted and that CIT should not be entitled to make such redactions in this criminal case document production. RW also contends that all the documents requested are relevant and integral parts of RW's defense in the criminal case in that they will show that RW was not a sham operation, and was not engaged in any kind of fraud.

## DISCUSSION

### I. Motion to Quash a Subpoena Standard

Federal Rules of Criminal Procedure section 17(c) governs the issuance of Subpoenas that seek production of documents and other items in criminal cases. Rule 17(c) states:

(c) Producing Documents and Objects.

(1) In General. A Subpoena may order the witness to produce any books, papers, documents, data, or other objects the Subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

(2) Quashing or Modifying the Subpoena. On motion made promptly, the court may quash or modify the Subpoena if compliance would be unreasonable or oppressive.

Fed.R.Crim.P. 17(c).

■ The purpose of rule 17(c) is not to facilitate discovery, but to enable a party to obtain and inspect evidentiary material prior to trial. *United States v. Nixon*, 418 U.S.

683, 698–99, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). The courts have held that Rule 17(c) should not be broadly interpreted as a discovery tool in criminal cases and that "courts must be careful that Rule 17(c) is not turned into a broad discovery device." *United States v. Cherry*, 876 F.Supp. 547, 552 (S.D.N.Y.1995) (quoting *United States v. Cuthbertson*, 630 F.2d 139, 146 (3d Cir.1980)).

■ In *United States v. Nixon*, the Supreme Court articulated a four-tiered test of factual issues for the trial court to resolve when deciding whether to quash or modify a subpoena duces tecum. 418 U.S. at 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039. Under the rule in *Nixon*, in order for a document request to be valid, it must not be unreasonable or oppressive. To demonstrate that a subpoena is not "unreasonable or oppressive" a party must show:

> (1) the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party can not otherwise properly prepare for trial without such production and inspection in advance to trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) the application is made in good faith and is not intended as a general "fishing expedition."

*Nixon*, 418 U.S. at 699–700, 94 S.Ct. 3090, 41 L.Ed.2d 1039.

■ In sum, the test in *Nixon* requires that a party seeking the production of the documents demonstrate that the materials are (1) relevant; (2) admissible; (3) specifically identified; and (4) not otherwise procurable. *Id.* The burden of proving relevance and admissibility is on the proponent of the subpoena. *Id.; United States v. Brown*, 1995 U.S. Dist. LEXIS 8996, at *9 (S.D.N.Y. June 30, 1995) (stating that the defendant issuing the subpoena "has [the] burden of specifically identifying the materials sought and showing that they are relevant and admissible").

In order to meet its burden, the proponent has to show that the documents sought are both relevant and admissible at the time of the attempted procurement. The fact that

they are potentially relevant or may be admissible is not sufficient. *See United States v. Marchisio*, 344 F.2d 653, 669 (2d Cir.1965); *United States v. Jenkins*, No. 02–Cr.1384, 2003 WL 1461477, at *4, 2003 U.S. Dist. Lexis 4312, at *14 (S.D.N.Y. Mar. 21, 2003). "In this respect, Rule 17(c) can be contrasted with the civil rules which permit the issuance of subpoenas to seek production of documents or other materials which, although not themselves admissible, could lead to admissible evidence." *Cherry*, 876 F.Supp. 547, 553 (S.D.N.Y.1995) (citing *Marchisio*, 344 F.2d at 669).

■ When determining whether a request for documents is specifically identified, the proponent must show that the subpoena is being used to obtain relevant evidence and not merely as a "fishing expedition" to expand discovery. "If the moving party cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful [may] turn up," the specificity requirement will not be satisfied. *United States v. Noriega*, 764 F.Supp. 1480, 1493 (S.D.Fla. 1991). A request is generally sufficiently specific where it limits documents to a reasonable period of time and states with reasonable particularity the subjects to which the documents relate. *See In re Grand Jury Subpoena*, 1992 WL 142014, at *7 (E.D.N.Y. 1992).

## II. The Subpoena at Issue

RW's Subpoena makes twenty-one (21) requests for documents from CIT. The Subpoena runs the gamut, soliciting from CIT a range of information including, among other things: all documents relating to RW customers; all documents relating to CIT's losses that were attributable to RW customers; all documents relating to RW reserve accounts; and all documents relating to any communications between CIT and the Government.

### A. Document Requests 1, 2, 4, 15 and 21

■ Requests 1, 2, 4, 15 and 21 in the Subpoena seek the following:

1) Documents relating or referring to losses to CIT attributable to [RW] customers,

including but not limited to an identification of all customers, the amount of loss attributed to each customer, and documents showing the basis for the calculations of all such losses.

2) Ledgers, including computer printouts, relating to all customers included in the response to item 1 above.

. . . . .

4) Cash journals reflecting deposits for all [RW] customers.

. . . .

15) All documents relating or referring to contacts between CIT and American Express Business finances relating to [RW].

21) All documents relating or referring to any efforts made by CIT to pursue delinquent [RW] accounts from February 2000–date.

CIT contends that it has already produced the requested documents during discovery in the state action and that they can be reasonably procured by RW itself though due diligence. RW admits that CIT need not reproduce the materials it has previously delivered in the state action, but merely provide it with the Bate-stamp numbers and certificates of authenticity for the documents sought.

The Court finds requests 1, 2, 4, 15 and 21 to be unreasonable. RW admits that its Subpoena seeks duplicate records, but states that it is not in the position to assess the extent to which the previous production satisfies CIT's obligation under this Subpoena. In the Court's view, it is unreasonable to burden CIT to re-produce documents that were already given to RW. As for the documents that were redacted, through due diligence, RW can provide a more detailed description of the redacted documents so that CIT can respond accordingly. In fact, in the state action, CIT provided RW with a privilege log that can be used to specify particular documents that were redacted. Through due diligence, it appears that RW can specify with greater particularity the documents that were produced in the state action and the documents that were not produced. It unreasonable for CIT to be burdened with searching its records to find what documents were previously produced where RW could discover this through their own efforts.

### B. Document Requests 3, 5, and 7–9

█ Requests 3, 5, and 7–9 in the Subpoena seek information regarding former customers of RW:

3) All documents relating to [RW] customers, including but not limited to, pay history statements.

. . . . .

5) All documents relating or referring t o a) suspense accounts; b) special suspense accounts; c) dummy accounts relating to [RW]. Such documents should include, without limitations all correspondence, letters, memos, e-mails, telephone messages, and notes of meetings.

. . . .

7) All documents relating or referring to [RW] reserve accounts.

8) All documents relating or referring to conversations with [RW] customers, including, but not limited to, message logs, message histories, memos, correspondence, e-mails, and notes of meetings.

9) Documents relating or referring to any customer related problems for [RW].

These requests for documents are overbroad and totally unreasonable. Requests for documents must be made with specificity so that the party subpoenaed can produce them and the court can determine whether they are relevant and not merely an attempt to "discover" all documents of any kind held by CIT. *See, e.g., United States v. Morris,* 287 F.3d 985, 991 (10th Cir.2002). "If the moving party cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful will turn up," the specificity requirement will not be met and the requests will be denied. *Noriega,* 764 F.Supp. at 1493.

Here, the court finds that RW has not met its burden in showing that the documents sought were for a specific purpose and not as a mere expansion of discovery. The document requests do not meet the specificity

requirement because they are too generalized; fail to adequately specify the information sought; and demand from CIT each and every document ever generated, created or received by CIT in relation to all 1,300 or more lessees of RW assigned by RW to CIT since 1992.

In its response to CIT's motion to quash, RW does not address the broadness of its requests, and only asserts that all the information sought was relevant. To show that a subpoena is not unreasonable or oppressive a RW must establish that the materials sought are admissible, relevant and specifically identified. A request is considered sufficiently specific where it states with reasonable particularity the subjects to which the documents relate and limits documents to a reasonable period of time.

Here, neither requirement is met. The requests contain no restriction on the time period. Rather, the Defendant asks for "[a]ll documents relating or referring to . . . ." In essence this could amount to a massive search for countless documents, at great expense to CIT, in order to attempt to properly comply. This burden is unreasonable and oppressive. Accordingly, that part of the Subpoena request with respect to these documents is denied.

### C. Document Requests 6, 13, and 14

■ Requests 6, 13 and 14 seek documents relating to information exchanged between CIT and the Government, as follows:

6) Documents reflecting an itemization of documents provided to the government. If such itemization does not exist in the form of a currently existing document, provide copies of all documents provided to the government.

.   .   .   .   .

13) All documents relating or referring to the Suspicious Activity Report prepared on or about May 4, 2000.

14) All documents identifying CIT employees who participated in the preparation of the Suspicious Activity Report on or about May 4, 2000.

CIT claims that the Government is already in possession of such documents and RW

should seek to obtain the information from the Government. The second prong of the *Nixon* test states that the party seeking the production of documents has the burden to show that the documents sought are not otherwise procurable by the exercise of due diligence. Since the information sought is apparently in the possession of the Government, it should therefore be readily obtained in the usual manner. This request is unreasonable and unnecessary. Accordingly, the request for these documents is denied.

### D. Document Request 10

Request 10 seeks all documents relating or referring to any attempts to retrieve RW pay histories from the CIT computer system. As stated above, in order for a document request to be deemed reasonable, the proponent of the request must show that the information sought is relevant at the time of procurement. RW states that this information is highly relevant because it shows CIT's attempts to retrieve information regarding its customer's problems with RW and this evidence, according to RW, bears on the reliability of CIT's record-keeping. CIT is not on trial here, and its reliability of record keeping is therefore not at issue. This request is also denied.

### E. Document Request 11

Request 11 seeks "[a]ll documents relating to CIT's profits from RW transactions for the years 1992–date." As repeatedly stated above, a request for documents must seek information that is relevant to the case at issue. RW contends that this information may be useful as evidence if the issue of the alleged loss has to be tried. However, the proponent of the Subpoena must show that the documents sought are both relevant and admissible at the time of procurement, rather than having the potential of being relevant at some time in the future. As such, the Court finds that this request is seeking evidence that is not presently relevant to the criminal trial against RW and must be denied.

### F. Document Request 16

Document request 16 seeks "[a]ll documents relating or referring to the use of lock

boxes for all private label sources." The term "lock box" is not defined in the RW papers. RW states that this information can be used in its defense to show that there was a problem with CIT's record keeping and invoice system and therefore RW was not engaged in fraud. As stated above, RW, not CIT is on trial here, and the issue is not whether CIT maintained a proper record keeping system. As such, this request must also be denied.

### G. Document Requests 17, 18, and 19

■ Request 17, 18, and 19 seek:

17) All documents reflecting, relating to, or referring to CIT's knowledge of [RW]'s making of payments on behalf of customers, including without limitation, all correspondence, letters, notes, e-mails, memos, telephone messages, and notes of meetings.

18) All documents relating or referring to CIT's knowledge of bankruptcies relating to any [RW] customer.

19) All documents relating or referring to any customers that were part of a[RW] portfolio who were also part of another CIT portfolio.

The Court finds that RW has met its burden of proving relevance with regard to these requests. The information sought could be used as evidence in support of the claim that RW did not deliberately try to conceal from CIT information about its customers. The information is also relevant to show that RW made the payments that the indictment alleges RW retained. As for specificity, the requests appear reasonable and sufficiently tailored so as not to be too burdensome on CIT. Therefore, the Court denies CIT's motion to quash with respect to requests 17, 18, and 19.

### H. Document Request 20

■ Document Request 20 seeks "[a]ll documents relating or referring to any offer by [RW] to purchase its CIT portfolio." CIT claims that this request is irrelevant because it does not have anything to do with potential defenses RW may have in the criminal case. In response, RW merely asserts that offers by it to purchase the CIT portfolio is relevant to show that RW attempted to mitigate

CIT's alleged loss. Whether RW attempted to mitigate CIT's loss is not relevant to RW's criminal liability. The court finds that this is insufficient to meet the burden of showing that the information sought is relevant to the criminal case. Accordingly, this request is denied.

### CONCLUSION

For all the foregoing reasons, it is hereby

**ORDERED,** that CIT's motion to quash the Subpoena is **GRANTED** with regard to requests 1–16, and 20–21, without prejudice to the issuance of a subpoena that conforms to the requirements of (1) relevance; (2) admissibility; (3) specificity; and (4) not being otherwise procurable; and it is further

**ORDERED,** that CIT' s motion to quash the Subpoena is DENIED with regard to requests 17, 18, and 19; and it is further

**ORDERED,** that CIT produce the documents as requested in this Order by June 6, 2005.

**SO ORDERED.**